| | | |
|---|---|---|
| Kevin Sroga, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 06594 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Toni Preckwinkle, Arnold Randal, Lisa Lee, | ) | |
| Michelle Gage, Daniel Betts, John Jekot, and | ) | |
| the Cook County Forest Preserve District, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Kevin Sroga used to work as an Aquatic Center Manager at a recreational swimming facility run by the Cook County Forest Preserve District. R. 63, Second Am. Compl. ¶¶ 11, 30.[1] In August 2012, the District fired Sroga, which led him to bring this suit against County and District officials and employees, as well as the District itself. *See* Second Am. Compl. Sroga alleges that, when he tried to unionize Aquatic Center employees, the Defendants retaliated against him, in violation of the First Amendment and Illinois state law.[2] *Id.* The Defendants now move to dismiss Sroga's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for failure to state a claim and for lack of subject-matter jurisdiction. *See* R. 65, Defs.' Mot. to Dismiss. For the reasons discussed below, the Defendants' motion to dismiss is granted in part and denied in part.

---

[1] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

[2] This Court has subject-matter jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

# I. Background

For purposes of this motion, the Court accepts as true the allegations in the Second Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Sroga began working for Defendant Cook County Forest Preserve District as a seasonal lifeguard in 2011. Second Am. Compl. ¶ 21. The next year, the District promoted Sroga to Aquatic Center Manager at one of the three aquatic facilities run by the District. *Id.* ¶¶ 11, 30. Around this time, the District also hired Defendants Michelle Gage, Daniel Betts, and John Jekot. *Id.* ¶¶ 16, 31. Betts and Jekot oversaw the District's Aquatic Centers and were Sroga's immediate supervisors, and Gage served as the District's Director of Human Resources. *Id.* ¶¶ 8-10, 31-32, 50.

During the 2011 and 2012 aquatic seasons, the District enacted new rules and regulations for Aquatic Center employees. Second Am. Compl. ¶¶ 19, 33. The new rules limited the number of hours that Aquatic Center employees could work at the Aquatic Centers, as well as at any other job they held down. *Id.* ¶¶ 34, 37. Lifeguards also could have their shifts cut short or be placed "on call" under the new rules. *Id.* ¶ 35. Sroga alleges that these rules displeased many Aquatic Center employees and lowered employee morale. *Id.* ¶¶ 27, 39.

In response to all of this, Sroga tried to organize Aquatic Center employees into a union. Second Am. Compl. ¶ 40. Sroga's efforts included speaking directly to Aquatic Center staff about unionizing, as well as to union representatives at the S.E.I.U. Local 73. *Id.* ¶¶ 41-42. Sroga also met with Defendant Lisa Lee, a Labor Relations Attorney for the District. *Id.* ¶¶ 44-45. During that meeting, Sroga told

Lee about the issues plaguing the Aquatic Center—including "the District's failure to properly safeguard the facility, hiring of inadequate staffers, hiring of unqualified staffers, promoting and retention of staff members that should not be in a role of responsibility or performing supervisory functions, and the effect of the policies and procedures on employee morale and the District's Lifeguard Service." *Id.* ¶ 47. Sroga also informed Lee that these issues had prompted him to try and organize Aquatic Center employees. *Id.* ¶ 49.

According to Sroga, Lee immediately relayed her conversation with Sroga—including, "[o]n information and belief," Sroga's efforts to unionize—to Betts, Jekot, and Gage. Second Am. Compl. ¶¶ 50-51. The next morning, Jekot called Sroga to schedule a meeting for later that day. *Id.* ¶ 52. When Sroga asked what the meeting was about, Jekot responded: "We [Betts and Jekot] need to talk to you. … We have to have a meeting." *Id.* ¶ 53. Sroga thereafter called Lee to see if she knew what was going on, but she denied any knowledge of the meeting. *Id.* ¶¶ 54-56. (Sroga (on information and belief) alleges that Lee did know that "the District's true intentions were to [fire] Sroga … ." *Id.* ¶ 57.)

At the meeting, Jekot and Betts handed Sroga a termination letter. Second Am. Compl. ¶¶ 59-60. The letter did not state the reason(s) for Sroga's firing. *Id.* ¶ 65. (Neither did Sroga receive any other documents at the time that may have helped explain his termination. *Id.*) When Sroga asked why he was fired, Betts told him, "We don't have to give you any reasons." *Id.* ¶ 63; *see also id.* ¶ 66 ("Sroga was not given any reasons for his discharge.").

Several weeks later, Sroga showed-up unannounced at the District's General Headquarters. Second Am. Compl. ¶ 77. He wanted access to his personnel file so that he could find out the reasons for the firing. *Id.* ¶ 78. Sroga alleges that he was not allowed to see his personnel file and was told that he would have to make an appointment with the Legal Department to do so, which he eventually did. *Id.* ¶¶ 80-81. Though the file contained "purported deficiencies in [his] work performance," Sroga alleges that no one had ever discussed those deficiencies with him before the firing. *Id.* ¶ 82. (Indeed, the District never took disciplinary action against Sroga during his tenure as an Aquatic Center employee. *Id.* ¶¶ 26, 76.) He also alleges that those deficiencies were pretextual, and that Jekot's anti-union animus was the driving force behind his termination. *Id.* ¶ 83.

Based on these allegations, Sroga brings nine counts against the Defendants in the Second Amended Complaint: (1) a Section 1983 claim based on violating the First Amendment's freedom-of-association clause against Jekot (Count One); (2) supervisory-liability claims based on the "cat's paw" doctrine against Betts and Gage (Counts Two and Three, respectively); (3) a municipal liability claim based on the "cat's paw" doctrine against the District (Count Four); (4) a freedom-of-association claim based on Article I, Section 5 of the Illinois Constitution against Jekot, Betts, and Gage (Count Five); (5) an Illinois common law retaliatory discharge claim against the District (Count Six); (6) an Illinois common law intentional interference with prospective economic advantage claim against Jekot (Count Seven); (7) a respondeat superior claim under Illinois common law against

the District (Count Eight); and (8) an indemnification claim under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102 (Count Nine). The Defendants now move to dismiss Counts Five and Six for lack of subject matter jurisdiction and the remaining counts for failure to state a claim. *See* Defs.' Mot. to Dismiss; R. 66, Defs.' Br.

## II. Standard

The Defendants bring their motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A Rule 12(b)(1) motion tests whether the Court has subject-matter jurisdiction, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999), while a Rule 12(b)(6) motion tests the sufficiency of the complaint, *Hallinan*, 570 F.3d at 820; *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). When reviewing a motion to dismiss under either rule, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Under Rule 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). These allegations "must be enough to raise a right to relief above the

speculative level," *id.*, and must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The allegations entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

In order to survive a Rule 12(b)(1) motion, the plaintiff must establish that the district court has jurisdiction over an action. *United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). "If subject matter jurisdiction is not evident on the face of the complaint, [then] the … Rule 12(b)(1) [motion is] analyzed [like] any other motion to dismiss, by assuming for the purposes of the motion that the allegations in the complaint are true.*" United Phosphorus*, 322 F.3d at 946. But "if the complaint is formally sufficient but the contention is there that there is *in fact* no subject matter jurisdiction, [then] the movant may use affidavits and other material to support the motion." *Id.* (emphasis in original).

### III. Analysis

### A. Count One (Jekot)

Count One alleges that Jekot violated the First and Fourteenth Amendments by firing Sroga for trying to union-organize the Aquatic Center staff. Second Am. Compl. ¶¶ 89-111. In response, Jekot contends that Count One should be dismissed, asserting that "[t]here is no factual substantiation for the conclusory

statement that Jekot terminated [Sroga] because of anti-union animus." Defs.' Br. at 6.

To make out a prima facie case for First Amendment retaliation, Sroga must establish that: (1) he was engaged in constitutionally protected activities; (2) he suffered a deprivation likely to deter associational activity; and (3) the First Amendment activity was a motivating factor in the employer's decision. *Redd v. Nolan*, 663 F.3d 287, 294 (7th Cir. 2011); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011); *Campion, Barrow & Assocs., Inc. v. City of Springfield, Ill.*, 559 F.3d 765, 768 (7th Cir. 2009). "Although making a 'prima facie case' is an evidentiary requirement and not a pleading standard, … this requirement lends guidance to the Court's determination whether [a plaintiff] ha[s] sufficiently alleged [his] First Amendment retaliation claim … ." *Schmidt v. Vill. of Glenwood*, 2015 WL 3918952, at *3 (N.D Ill. June 24, 2015). The parties do not dispute the second element— indeed, neither party even addresses it—so only the first and third elements are at issue for purposes of deciding this motion to dismiss.[3]

### 1. Constitutionally Protected Activity

To survive the motion to dismiss, Sroga must first allege facts establishing that his union-related activity falls within the purview of the First Amendment. *See Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003); *Kasak v. Vill. of Bedford Park*, 514 F. Supp. 2d 1071, 1076 (N.D. Ill. 2007). Courts apply the *Connick-Pickering* test to determine whether an employee's associational activity is constitutionally

---

[3]The defense did not raise qualified immunity in the dismissal motion.

protected.[4] *Gregorich v. Lund*, 54 F.3d 410, 414 (7th Cir. 1995) (discussing *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983)); *see also, e.g.*, *Wright v. Vill. of Franklin Park*, 2008 WL 820560, at *19 (N.D. Ill. Mar. 25, 2008) (applying *Connick-Pickering* test to determine whether the plaintiff engaged in any protected expressive activity); *Kasak*, 514 F. Supp. 2d at 1076 (same). Under that test, an employee's associational activity will only receive protection if it was "on a matter of public concern." *Gregorich*, 54 F.3d at 414 (citations omitted); *see also Connick*, 461 U.S. at 141-42; *Pickering*, 391 U.S. at 568-70. Associational activity is of public concern so long as it relates to "any matter of political, social, or other concern to the community." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (citation omitted). Whether this standard is met depends on "the content, form, and context" of the activity. *Connick*, 461 U.S. at 147-48. The second element of the *Connick-Pickering* test requires courts to determine whether the employee's interest in the activity "outweigh[s] the

---

[4] The Seventh Circuit has questioned whether the public concern standard applies to pure freedom-of-association claims, as opposed to hybrid claims that involve both First Amendment speech and associational activity. *See Balton v. City of Milwaukee*, 133 F.3d 1036, 1040 (7th Cir. 1998); *id.* at 1041 (Cudahy, J., concurring in judgment); *see also Berry v. Ill. Dep't of Human Servs.*, 2003 WL 22462547, at *12 (N.D. Ill. Oct. 29, 2003) ("To the extent [union rights and organizing] is purely an issue of exercising the right to associate, the public concern standard does not necessarily apply. … In hybrid situations, where there is an issue of speaking out on union-related activities, the public concern standard should be applied while recognizing that there may be distinctions when applying it to conduct that also involves associational rights."); *Quinn v. Vill. of Elk Grove Bd. of Fire & Police Comm'rs*, 2002 WL 31875464, at *3 (N.D. Ill. Dec. 24, 2002) (observing that "[t]here is a disagreement within the Seventh Circuit about the appropriate legal standard to apply to First Amendment retaliation claims arising from associational rights."). Nevertheless, the Seventh Circuit has applied the *Connick-Pickering* test to freedom-of-association rights, *see Klug v. Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 857 (7th Cir. 1999); *Gregorich v. Lund*, 54 F.3d 410, 414 (7th Cir. 1995); *Marshall v. Allen*, 984 F.2d 787, 798 (7th Cir. 1993); *Griffin v. Thomas*, 929 F.2d 1210, 1214-15 (7th Cir. 1991);, and that is what the Court will do here too.

State's interest in promoting the efficiency of public services." *Gregorich*, 54 F.3d at 414 (citations omitted); *see also Pickering*, 391 U.S. at 568-70; *Connick*, 461 U.S. at 150-51. If so, then the employee's associational activity will receive First Amendment protection.

Here, the allegations in the Second Amended Complaint are sufficient to establish that Sroga's union-organizing activity constitutes freedom of association protected by the First Amendment. Courts in this Circuit routinely hold that union activity touches upon matters of public concern, particularly if the employee's motivation for doing so was of public concern, and not for some purely private interest. *See, e.g.*, *Gregorich*, 54 F.3d at 416 (holding that the plaintiff's "attempt to obtain representation for all research attorneys in the Fourth district went beyond his self-interest and made his activity subject to the requirements of *Pickering* and *Connick*"); *Wright*, 2008 WL 820560, at *20 ("[T]o the extent that Wright's association with the Union was intended to further the union's advocacy of issues such as these, that association would address a matter of public concern as well."); *Kasak*, 514 F. Supp. 2d at 1077 ("Plaintiff's participation in the [Village Collective Bargaining Unit's] formation and his representation of the Unit Members' interests exceeded his self-interest and his activity touched upon matters of public concern."). So too here. Sroga has alleged that he sought to unionize the Aquatic Center staff in response to new policies implemented by the District that limited the number of hours employees could work. Second Am. Compl. ¶¶ 19, 33-34, 37, 39-40. The Court can also infer that the workplace issues that Sroga discussed with Lee—"the

District's failure to properly safeguard the facility, hiring of inadequate staffers, hiring of unqualified staffers, promoting and retention of staff members that should not be in a role of responsibility or performing supervisory functions, and the effect of the policies and procedures on employee morale and the District's Lifeguard Services," *id.* ¶ 47—motivated Sroga's union-organizing efforts. Not only did Sroga listen to (and then convey) Aquatic Center employees' concerns, *id.* ¶ 41, he specifically spoke with union representatives and Defendant Lee (a Labor Relations Attorney for the District) on behalf of those employees, *id.* ¶ 42. These allegations are enough to establish that Sroga sought to obtain union representation to effectuate a change in the District's policies for the benefit of the Aquatic Center staff. *See Gregorich*, 54 F.3d at 416. Sroga's alleged union-organizing activity meets the public concern requirement.

The union-organizing activity also satisfies the *Pickering* balancing test—that is, Sroga's interest in promoting unionization outweighs (so far as the complaint shows) the disruptive impact that the activity had on the District's delivery of services to the public and on the efficacy of the workplace. *See Pickering*, 391 U.S. at 568-70. To be sure, the government has an interest in "avoid[ing] potential disruption in light of any close working relationships essential to administering public responsibilities, and the 'practical reality of governance that those with policy-making responsibilities must have faithful agents.'" *Kasak*, 514 F. Supp. 2d at 1078 (quoting *Gregorich*, 54 F.3d at 417 (quotations omitted)). So the fact that Sroga was an Aquatic Center *manager* attempting to obtain union

representation for *employees* could indeed impact the extent to which Sroga had a constitutional right to promote union organization for those employees. *See id.* But there are, at the dismissal-motion stage, too many unanswered factual questions to conclusively resolve the *Pickering* balance. For example, what is the extent of Sroga's supervisory authority over employees (he himself had at least two supervisors, and probably more layers of supervision above that)? What disruptive effect (if any) would his union-organizing have on his own workplace relationships with his supervisors? These are questions for which discovery is needed, and then the defense may, depending on what is uncovered, renew the argument at the summary judgment stage. For now, Sroga has plausibly alleged that his unionization effort qualifies for First Amendment protection. *See Cunningham v. Vill. of Mount Prospect*, 2002 WL 31628208, at *5 (N.D. Ill. Nov. 19, 2002) (observing that "[t]he First Amendment protects the right to advocate, either individually or through association, on behalf of a union. As a result, for purposes of this motion to dismiss, Cunningham's speech and association can only be concluded to be related to matters of public concern and protected by the First Amendment" (citation omitted)).

### 2. Motivating Factor

Next to consider is whether the Second Amended Complaint sufficiently alleges that Sroga's constitutionally protected activity was a motivating factor for his firing. Although Sroga must sufficiently prove (at the trial stage) that his union-organizing was a "substantial" motive for his firing, he need not prove that it was

the *sole* factor. *Mount Healthy City Sch. Dist. Bd. v. Doyle*, 429 U.S. 274, 287 (1977); *Greene v. Doruff*, 660 F.3d 975, 978 (7th Cir. 2011); *Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004).[5] Timing is one consideration when determining whether an employer had a retaliatory motive: "When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied." *Lalvani v. Cook Cty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001). An inference of causation may even be drawn solely on the basis of suspicious timing where "no more than a few days … elapse between the protected activity and the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Of course, in addition to suspicious timing, an employee can also rely on oral or written statements that could be reasonably interpreted as evidence of retaliatory motive. *Id.*

Here, the Second Amended Complaint adequately alleges facts from which to plausibly infer that Sroga's unionization effort was a motivating factor in the firing. The timing of the firing alone is suspicious enough, at least when the allegations are assumed to be true. Sroga sought to unionize the Aquatic Center staff beginning in Summer 2012. Second Am. Compl. ¶¶ 39, 40. Sroga then met with District labor relations attorney Lee on August 23, 2012 to tell her about his unionization efforts. *Id.* ¶¶ 44-45, 49. The very next afternoon, Sroga was fired during a meeting that Jekot had just set-up earlier in the day. *Id.* ¶¶ 52, 58. The fact that no one would

---

[5]If Sroga does prove that unionizing was a motive for his firing, then the defense can still avoid liability by proving (the defense would bear the burden of proof) that the District would have fired Sroga even absent the protected activity. *Mount Healthy*, 429 U.S. at 287.

tell Sroga why he was being fired that day also suggests that Jekot had a retaliatory motive. *Id.* ¶¶ 63, 65. This is especially so given Sroga's allegations that the District had never taken disciplinary action against him before the firing. *Id.* ¶ 76. What's more, the Second Amended Complaint also alleges that once Sroga was finally able to obtain his personnel file, he discovered that "[t]he file contained purported deficiencies in [his] work performance, none of which had ever been communicated to or discussed with [him]." *Id.* ¶¶ 80-82. These allegations, which the Court must accept as true at this stage in the litigation, are enough for the retaliation claim (Count One) to survive the dismissal motion.

## B. Counts Two (Betts) and Three (Gage)

Counts Two and Three allege that Daniel Betts, who was Jekot's supervisor, and Michelle Gage, Director of Human Resources for the Cook County Forest Preserve District, also violated the First and Fourteenth Amendments by dismissing Sroga on account of his union-organizing activity. Second Am. Compl. ¶¶ 112-129. Sroga argues that "under the cat's paw theory of individual supervisor liability," both Betts and Gage should be liable to him for violations of his rights under 42 U.S.C. § 1983, because each either "supervised and directed" Jekot "in the termination of Sroga's employment" or "knew, or reasonably should have known" that a subordinate was acting in a way to deprive Sroga of his rights of free assembly and association. *Id.* ¶¶ 114-115, 120, 123-124, 129. In response, Defendants contend that Counts Two and Three should be dismissed because there are no factual allegations from which to infer that Betts or Gage "was personally

involved in unconstitutional conduct." R. 73, Defs.' Reply Br. at 3. More specifically, Defendants argue that "there is no factual basis for the contention that Betts relied upon any alleged discriminatory conduct of Jekot in terminating [Sroga's] employment." Defs.' Br. at 7. With regard to Gage, Defendants claim that there is no "allegation that Gage participated in any form or fashion" in Sroga's dismissal decision. *Id.* at 8.

It is true that Sroga cannot rely on any theory of vicarious liability to snare either Betts or Gage. Neither the "cat's paw theory" of liability nor any other respondeat superior theory of liability applies to supervisors in Section 1983 cases. *Coleman v. Dunlap*, 695 F.3d 650, 654 (7th Cir. 2012) ("If [the defendant] was not personally involved with the employment decisions, or was a cat's paw of someone else who held a political grudge, that would be a substantive problem with [the plaintiff's] claim against [the defendant]—for there is no vicarious liability for a subordinate's acts … ." (citation omitted)); *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir. 1984) ("Not only is the doctrine of *respondeat superior*, which makes the employer liable without fault on his part for torts committed by his employees in the furtherance of their employment, not applicable in actions under section 1983, but the doctrine has no reference (despite its name) to the liability of another employee who happens merely to be the supervisor, but not the employer, of the employee who commits the tort." (citation omitted)). In order to state a claim against Betts and Gage for retaliation, Sroga must plead facts from which to

plausibly infer that those two were "personally at fault" for violating Sroga's First Amendment rights. *Id.* at 1391.

With regard to Gage, the Second Amended Complaint does not come close to doing this. Sroga alleges only that he "encountered" Gage sometime during Sroga's post-firing visit to the Human Resources office, with no further detail about what happened during this "encounter[]." *See* Second Am. Compl. ¶ 79. Every other allegation against Gage is based on an assumption about Gage's supervisory role, but even there Sroga does not explain what supervisory authority Gage (who was the Director of Human Resources) exercised over Sroga's firing. There is no allegation that Gage was present at the termination meeting, or how she was otherwise involved in the firing decision. Gage must be dismissed from the case for now; if Sroga develops any facts in discovery against Gage, then he may move to add her back to the case.

In contrast, there are enough allegations to keep Betts in the case. Betts was Jekot's supervisor, and leading up to the hastily arranged termination meeting, Jekot said that "[w]e"—which Sroga interpreted to be Betts and Jekot—needed to meet with Sroga. Second Am. Compl. ¶ 53. And then Betts did attend the crucial termination meeting; indeed, the only attendees were Betts, Jekot, and Sroga. *Id.* ¶ 59. During the meeting, when Sroga asked why he was being fired, it was Betts who allegedly responded like a villain from a low-budget movie script: "Betts replied stating, 'We don't have to give you any reasons,' while simultaneously placing both hands behind the back of his head (as if he were going to do a sit-up), and leaned

back in his office chair." *Id.* ¶ 63. Based on Betts's participation in the firing meeting and his refusal to tell Sroga why he was being fired, it is plausible to infer that he knew about, and even agreed with, Jekot's alleged retaliatory motive for firing Sroga. Of course, it is one thing to allege this set of facts and enjoy the benefit of the dismissal-motion standard, and quite another to prove it to a jury when Sroga bears the burden of proof. But, for now, the claim against Betts survives.

### C. Count Four (*Monell* claim v. District)

Count Four attempts to allege a *Monell* claim against the Cook County Forest Preserve District for the same violation of Sroga's rights of assembly and association. Second Am. Compl. ¶¶ 130-132. The District argues that Sroga's claim fails to satisfy any path to municipal liability under *Monell*: (1) "an actual official policy"; (2) "a practice or custom that, although not officially authorized, is widespread and well-established"; or (3) "a deliberate act from a District employee with final policy-making authority which caused an unconstitutional deprivation of protected rights." Defs.' Br. at 9 (summarizing the holding of *Monell v. Department of Sociacal Services*, 436 U.S. 658 (1978)).

Sroga appears to argue that the "cat's paw" theory of liability can apply against the District. "In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook v. IPC*

*Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). The Seventh Circuit has not yet definitively answered whether the cat's paw theory of liability applies to Section 1983 cases against municipalities. *Simstad v. Scheub*, 816 F.3d 893, 902 (7th Cir. 2016) ("It is not clear how, or whether, this type of imputed motive applies in the municipal liability context. [*Monell*] … prohibits finding municipal liability through the theory of *respondeat superior*. We have wondered whether the cat's-paw theory can support entity liability under the civil rights laws when the entity is a municipal corporation and the biased or retaliatory subordinate is not a policy-maker. This is not the case, however, in which we need to confront that issue." (citations omitted); *see also Greene v. Cook Cty. Sheriff's Office*, 79 F. Supp. 3d 790, 812 (N.D. Ill. 2015).

The Supreme Court's decision in *City of Saint Louis v. Praprotnik*, 485 U.S. 112 (1988), however, suggests that the cat's paw theory does not provide a fourth route to municipal liability outside of the three ways set forth in *Monell*. In *Praprotnik*, the Supreme Court rejected the notion that the employment decision of a supervisor who was *not* a final policymaker of the municipality could subject the city to liability under § 1983. 485 U.S. at 128-130. Confining municipal responsibility to final policymakers under local law respects the State-federal balance: "The States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms." *Id.* at 124. Here, Sroga is trying to do exactly what the plaintiff unsuccessfully tried in *Praprotnik*—specifically, to hold a municipality liable for a

supervisor's exercise of discretion even though the supervisor is not a final policymaker. Allowing an expansion of *Monell* via the cat's paw theory would be "a step towards overruling *Monell* and adopting the doctrine of *respondeat superior*." *Praprotnik*, 485 U.S. at 131.

To be sure, the Supreme Court has interpreted other federal statutory remedies for employment discrimination to allow for a form of cat's paw liability. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 417-19 (2011) (interpreting Uniformed Services Employment and Reemployment Rights Act, and noting textual similarity to Title VII, 42 U.S.C. § 2000e-2(a), (m)). But *Staub* emphasized that its analysis was based on the overlay of traditional common-law principles to employment-discrimination statutes, 562 U.S. at 419-20, whereas *Monell* and *Praprotnik* make clear that those ordinary tort and agent-employer principles specifically do *not* apply to municipal liability under § 1983. *Monell*, 436 U.S. at 692-94; *Praprotnik*, 485 U.S. at 121-22; *see Waters v. Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) (noting, but not definitively resolving, the problem with extending *Staub* to municipal liability under § 1983). Without any allegation for municipal liability grounded in *Monell*, the municipal-liability claim (Count Four) is dismissed.

### D. Counts Five and Six (Illinois Constitution and common law)

In addition to the federal-law claims, Sroga asserts two state-law claims premised on the same conduct that underlies the federal-law claims—that is, he was fired in retaliation for his union-organizing activity. Sroga argues that the retaliatory firing violated not only the First Amendment in the federal Constitution,

but also the Illinois Constitution's guarantee of the right to assemble (Count Five), Second Am. Compl. ¶¶ 133-141, and Illinois common law (Count Six), *id.* ¶¶ 142-145. The Illinois constitutional claim is asserted against Jekot, Betts, and Gage, while the common-law retaliatory discharge claim is brought against the District.

The defense responds that these claims should be dismissed because "the State of Illinois has placed exclusive jurisdiction for this claim within the Illinois Labor Relations Board," specifically through the Illinois Public Labor Relations Act. Defs.' Br. at 12. The Labor Relations Act does contain language that ostensibly covers Sroga's allegation that he was fired for trying to organize a union: "It shall be an unfair labor practice for an employer or its agents: (1) to interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization … ." 5 ILCS 315/10(a)(1). With this statutory definition in hand, some Illinois cases hold that any claim that is characterized as an "unfair labor practice" under the Labor Relations Act automatically comes under the exclusive jurisdiction of the Labor Relations Board. *Foley v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31, Local No. 2258*, 556 N.E.2d 581, 582-84 (Ill. App. Ct. 1990); *Cessna v. City of Danville*, 693 N.E.2d 1264, 1268 (Ill. App. Ct. 1998); *Stahulak v. City of Chi.*, 684 N.E.2d 907, 911-912 (Ill. App. Ct. 1997). By this logic, the Defendants reason, Sroga's state constitutional and common-law claims must be preempted because interference with union formation is an "unfair labor practice."

The problem with this argument is that Sroga is not trying to bring an "unfair labor practice" claim. Sure, as the cases cited earlier hold, it is clear that a plaintiff who brings an unfair labor practice claim under the Labor Relations Act *itself* must present that claim to the Labor Relations Board. But Sroga is not invoking the Labor Relations Act; instead, he is asserting the state-law claims under the Illinois *Constitution* and under Illinois *common law*. So the cases cited earlier do not answer whether the Labor Relations Act preempts the state constitutional and common-law claims. An analysis from first principles is needed.[6]

In order for an Illinois statute to deprive trial courts of original jurisdiction over other claims, the statute must explicitly provide that the state agency has exclusive jurisdiction. *City of Kankakee v. Dep't of Revenue*, 988 N.E.2d 723, 729 (Ill. App. Ct. 2013) ("Trial courts may be divested of their original jurisdiction by the legislature where it places original jurisdiction in an administrative agency. *Employers Mutual Cos. v. Skilling*, 644 N.E.2d 1163 (Ill. 1994). A statute that divests the trial court of original jurisdiction must do so explicitly."). Absent explicit divestment of jurisdiction, an Illinois state agency authorized to hear cases of a given type shares jurisdiction concurrently with the trial court. *See Fredericks v. Liberty Mut. Ins. Co.*, 627 N.E.2d 782, 787 (Ill. App. Ct. 1994) ("[C]ourts need not relinquish their authority over a matter to the agency" in cases where "agency's technical expertise is not likely to be helpful or there is no need for uniform

---

[6]*Lauth v. McCollum*, 424 F.3d 631, 632 (7th Cir. 2005), cited multiple times by the Defendant, is not on point. Defs.' Br at 11-12; Defs.' Reply Br. at 6. The part of the opinion that the Defendants rely on is entirely a side discussion and not necessary to the decision's holding; the actual issue decided by that opinion was whether the plaintiff stated a viable Equal Protection Clause "class of one" claim.

administrative standards."). Here, the Labor Relations Act does not contain explicit text vesting exclusive jurisdiction over unfair labor practices (or any other type of claim) in the Labor Relations Board. *See* 5 ILCS 315/1 *et seq.*

That said, even when a law—like the Labor Relations Act—does not contain explicit *text* calling for preemption, an Illinois statute still could, by clear implication, divest trial courts of jurisdiction over a claim. Indeed, because the Labor Relations Act creates a comprehensive regulatory scheme, Illinois courts hold that giving the Board exclusive jurisdiction is necessary to prevent forum shopping and avoid burdening the state courts, as well as to preserve the uniformity promoted by vesting exclusive jurisdiction in the Board. *See, e.g.*, *Foley*, 556 N.E.2d at 584. For example, to avoid undermining the Labor Relations Act, the Illinois Appellate Court held in *Foley v. American Federation of State, City, and Municipal Employees* that the Labor Relations Act requires that only the Board may hear duty-of-fair-representation claims brought against unions. *Id.* And *Foley* relied on an Illinois Supreme Court decision, *Board of Education of Community School District No. 1, Coles County v. Compton*, that arrived at the same exclusive-jurisdiction conclusion for enforcing collective-bargaining arbitration awards under the Illinois Educational Labor Relations Act (IELRA). 526 N.E.2d 149 (Ill. 1988). As *Foley* explained, the Educational Labor Relations Board had exclusive jurisdiction "even though no express language appears in the IELRA which divests the courts of such jurisdiction," on account of "a comprehensive regulatory scheme for public sector bargaining in Illinois" and concerns over "forum shopping" and "unnecessary

litigation" in an "already overburdened court system." *Foley*, 556 N.E.2d at 584 (describing holding of *Compton*, 526 N.E.2d at 153-54) (quotations omitted); *see also Cessna*, 693 N.E.2d at 1268 ("We agree with the reasoning of *Foley* and conclude that plaintiff's claims against the Unions are within the exclusive jurisdiction of the Board … despite absence of the word "exclusive.").

Cases like *Foley* and *Compton* demonstrate that the Labor Relations Act, even without an explicit textual basis, can vest exclusive jurisdiction in the Labor Relations Board for labor-management disputes. Indeed, a plausible argument could be made that even an Illinois constitutional claim or common-law claim that somehow arises from a collective bargaining agreement or from a failure of a union to fairly represent a member would still be subject to the exclusive jurisdiction of the Labor Relations Board. Non-exclusive jurisdiction over collective bargaining agreements in particular would multiply litigation and undermine the stability that comes with uniform interpretation of those agreements by the Labor Relations Board. The Labor Relations Act specifically provides that the Board "shall have jurisdiction over collective bargaining matters … ." 5 ILCS 315/5(a-5).[7] The Labor Relations Act also elevates collective bargaining agreements negotiated under the Act over any other laws, executive orders, or administrative regulations relating to

---

[7]Section 5(a-5) refers to a "State Panel," but in 2000, the Labor Relations Board replaced two separate boards (including what had been known as the "State Panel") and took on all of "the powers, duties, rights, and property, including contractual rights and obligations" of both the Illinois State Labor Relations Board and the Illinois Local Labor Relations Board. 5 ILCS 315/5.1(a), (b).

wages, hours, and employment conditions or relations. 5 ILCS 315/15(a), (b) (2010).[8]
So disputes over a collective bargaining agreement, even if dressed as an Illinois
constitutional or common-law claim, still might very well be under the Board's
exclusive jurisdiction.

But as applied to Sroga's case, this principle gets the defense only so far.
That is because, as noted earlier, Sroga's claims are premised *not* on the Labor
Relations Act, but on the Illinois Constitution and Illinois common law. Put another
way, Sroga's claims are *independent* of the Labor Relations Act, so they are outside
of the Board's exclusive jurisdiction. In an analogous context, the Seventh Circuit
applied that test of independence to determine whether the Illinois Human Rights
Act preempted a common-law tort. In *Mendez v. Perla Dental*, the Seventh Circuit
explained that even when an agency has exclusive jurisdiction over claims arising
under its Act (there, the Illinois Human Rights Commission's jurisdiction over
claims under the Human Rights Act), a common-law claim that can be established
completely independently of the Act is not preempted. 646 F.3d 420, 422 (7th Cir.
2011) ("Where the complaint alleges a tort recognized at common law, such that the
elements of the tort can be established without reference to the legal duties created
by the Act, the state law claim is not preempted by the Act.").[9] The converse also

---

[8]The 2010 version of this statute is cited because the 2014 amendment to this
section, along with the entirety of the Public Act 98-599 (which reformed the Pension Code),
was held unconstitutional in *In re Pension Reform Litigation*, 32 N.E.3d 1, 30 (Ill. 2015).

[9]The Illinois Supreme Court also has noted the distinction between *new* rights
created by statutory schemes versus already existing common-law rights; the legislature
undoubtedly may set the jurisdictional limits on newly created statutory rights. *See Bd. of
Educ. of Warren Twp. High Sch. Dist. v. Warren Twp. High Sch. Fed'n of Teachers*, 538
N.E.2d 524, 529 (Ill. 1989) (holding that the legislature may "preclude or limit the

makes sense: if a claim's viability depends on a statute that otherwise puts a comprehensive remedial scheme in the hands of an administrative agency, then the claim really is a statutory claim that is in that agency's exclusive jurisdiction. For example, a union's "duty of fair representation" arises from the Labor Relations Act—that duty has no previously existing counterpart in the common law or in state constitutional law—so the Labor Relations Board has exclusive jurisdiction over that type of claim. *Cessna*, 693 N.E.2d at 1269( "[T]here simply is no common law duty of fair representation.").

Here, Sroga can state a claim for relief under the Illinois Constitution and Illinois common law independently of the Labor Relations Act.[10] On the constitutional claim, Article I, Section 5 of the Illinois Constitution provides for a right to assembly: "The people have the right to assemble in a peaceable manner, to consult for the common good, to make known their opinions to their representatives and to apply for redress of grievances." Ill. Const. art. I, § 5. The Defendants do not actually argue that the Illinois Constitution's right to associate is any different from the federal version of that right in the First Amendment of the United States Constitution; instead, the defense put all its eggs in the exclusive-jurisdiction argument. Defs.' Br. at 11-12. So, because Sroga stated an adequate claim against Jekot and Betts for a violation of the First Amendment, Count Five also survives

---

jurisdiction of the circuit courts" when it "enacts a comprehensive statutory scheme, creating rights and duties which have no counterpart in common law or equity").

[10]There are district court cases that come out different ways on this issue when it comes to the Illinois Educational Labor Relations Act, *compare Jones v. Harris*, 1989 WL 24132, at *4-5 (N.D. Ill. Mar. 16, 1989), *with Andrekus v. Bd. of Educ. of Dist. U-46*, 2003 WL 1475033, at *3-4 (N.D. Ill. Mar. 20, 2003), but the Seventh Circuit has set forth the applicable preemption test under Illinois law.

against Jekot and Betts. Because no First Amendment claim was sufficiently stated against Gage, she is correspondingly dismissed from Count Five.

With regard to the common-law retaliatory discharge claim against the District (Count Six), here too the claim can be established without any reference to the Labor Relations Act. To make out a claim for retaliatory discharge, Sroga must show: (1) that he was discharged in retaliation for his activities; and (2) that his discharge violates a clear public policy mandate. *Barr v. Kelso-Burnett Co.*, 478 N.E.2d 1354, 1358 (Ill. 1985); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876 (Ill. 1981). To determine Illinois public policy, state courts look at the state's constitution, its statutes, and in some cases the state courts' judicial decisions. *Zientara v. Long Creek Twp.*, 569 N.E.2d 1299, 1303-04 (Ill. App. Ct. 1991) ("In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions."). Here, Sroga can point to the Illinois Constitution as the source of the public policy to protect union-organizing activity without the threat of a retaliatory firing. The defense simply invokes the Labor Relations Act and does not actually present any argument on whether the elements of the common-law claim can be established without reference to the Act. Defs.' Br. at 12. Thus, in the end, Sroga's common-law retaliatory discharge claim against the District is essentially the same as the state constitutional claim, so the claim survives.

### E. Count Seven (Intentional Interference)

In Count Seven, Sroga alleges that Jekot is liable under Illinois common law for intentional interference with prospective economic advantage. Second Am. Compl. ¶¶ 146-149. To maintain this claim, one must show: "(1) plaintiff's reasonable expectation of entering a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful or intentional interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Soderlund Bros. v. Carrier Corp.*, 663 N.E.2d 1, 7-8 (Ill. App. Ct. 1995). Jekot responds that Sroga's intentional interference claim should be dismissed because "an employer cannot interfere with its own business relationship with its employee." Defs.' Br. at 13.

Illinois case law is not entirely consistent on whether an employee can be sued for tortious interference with a coworker's employment relationship with their joint employer. The bulk of relevant Illinois decisions do allow plaintiffs to bring tortious interference claims against coworkers. *See, e.g.*, *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 678 (Ill. 1989); *Popko v. Cont'l Cas. Co.*, 823 N.E.2d 184, 187 (Ill. App. Ct. 2005) (observing that jury returned a verdict against defendant—the plaintiff's supervisor—on the plaintiff's tortious interference claim); *Citylink Grp., Ltd. v. Hyatt Corp.*, 729 N.E.2d 869, 877 (Ill. App. Ct. 2000); *Chapman v. Crown Glass Corp.*, 557 N.E.2d 256, 263 (Ill. App. Ct. 1990); *Stewart v. Ost*, 491 N.E.2d 1306, 1309 (Ill. App. Ct. 1986); *Powers v. Delnor Hosp.*, 481 N.E.2d

968, 970 (Ill. App. Ct. 1985); *accord Constantino v. Morningstar, Inc.*, 2004 WL 842508, at *2 (N.D. Ill. Apr. 15, 2004); *Mustafa v. Ill. Dept. of Public Aid*, 1997 WL 194980, at *5 (N.D. Ill. March 14, 1997); *Otterbacher v. Nw. Univ.*, 838 F. Supp. 1256, 1261 (N.D. Ill. 1993); *Diamond v. Chulay*, 811 F. Supp. 1321, 1334 (N.D. Ill. 1993). A few Illinois decisions, however, have held otherwise, dismissing interference claims brought against a coworker. *See, e.g.*, *Quist v. Bd. Of Trs. of Cmty. Coll. Dist. No. 525*, 629 N.E.2d 807, 812 (Ill. App. Ct. 1994) ("Inasmuch as plaintiff in this case charges that the president of defendant college made a statement allegedly threatening to her future employability, she is alleging interference by an agent of her employer, defendant college. … Accordingly, we hold that the trial court properly dismissed plaintiff's [tortious interference claim]."); *Eisenbach v. Esformes*, 582 N.E.2d 196, 199 (Ill. App. Ct. 1991) (same). These few courts reason that alleging an interference claim against a coworker is akin to alleging that the employer interfered with its own employment relationship. But the majority view is more sensible. Unless the defendant-coworker is the owner of the business (like a sole proprietor), then the plaintiff is indeed suing an individual—be it a coworker or not—for getting in the way of the plaintiff's relationship with the employer; in that situation, the plaintiff is *not* suing the employer for interfering with its own relationship.

It is worth noting, however, that in most of the decisions allowing for this type of interference claim against a coworker, there is an additional element of the interference claim: the plaintiff must show that the coworker acted in his or her

*own* interests and *against* the interests of the principal (that is, the employer). *See, e.g., Citylink Grp.*, 729 N.E.2d at 877 ("Corporate ... agents are normally privileged against claims that their activities interfered in a third party's relationships with their principals. ... To overcome the privilege, plaintiffs must allege or prove that a defendant acted in its own interests and contrary to the interests of its principal, or engage in conduct totally unrelated or antagonistic to the interest giving rise to the privilege."). So, although Jekot's motion to dismiss Count Seven is denied, Sroga should be aware that this claim may be subject to dismissal at the summary judgment stage if he cannot establish that his firing was *not* in the District's best interests.

### F. Counts Eight (Respondeat Superior) and Nine (Indemnification)

The final two counts are easy to decide. In Count Eight, Sroga alleges that the Forest Preserve District is liable for Counts One, Two, Three, Five, and Seven through respondeat superior. Second Am. Compl. ¶¶ 150-152. In Count Nine, Sroga alleges that the District, through the County, is liable to indemnify plaintiff for judgments against the District or the named individual defendants. *Id.* ¶¶ 153-158.

On Count Eight, as discussed earlier, it is well established that respondeat superior is not applicable to § 1983 claims. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("The doctrine of *respondeat superior* does not apply to § 1983 actions; thus to be held individually liable, a defendant must be 'personally responsible for the deprivation of a constitutional right.'") (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). So the District cannot be held liable

under respondeat superior liaibility for Counts One, Two, and Three (and Count Three against Gage was dismissed anyway for failure to state a claim). But Count Eight survives as to the state-law claims in Count Five (Illinois Constitution right to associate) and Count Seven (tortious interference).

Lastly, on Count Nine, the District would be required under the Illinois Tort Immunity Act to pay any judgment against its employees, provided they acted within the scope of employment. 745 ILCS 10/9-102. So to the extent that counts against individual Defendants survived, this indemnification claim survives too.

## IV. Conclusion

In sum, the following claims are dismissed:

▶ Count Three (First Amendment) against Gage.

▶ Count Four (*Monell* claim) against the District.

▶ Count Five (Illinois Constitution) as against Gage.

▶ Count Eight (respondeat superior) against the District as to Counts One, Two, and Three.

▶ Count Nine (indemnification) against the District as to Count Three and Count Five (as against Gage).

The remaining claims are:

▶ Count One (First Amendment) against Jekot.

▶ Count Two (First Amendment) against Betts.

▶ Count Five (Illinois Constitution) as against Jekot and Betts.

▶ Count Six (Illinois retaliatory discharge) against the District.

▶ Count Seven (tortious interference) against Jekot.

▶ Count Eight (respondeat superior) against the District as to Counts Five and Seven.

▶ Count Nine (indemnification) against the District as to Counts One, Two, Five, and Seven.

The status hearing of January 25, 2017, is reset to February 2, 2017, at 9 a.m., at which time the Court will set the fact discovery deadline. The parties previously described the remaining discovery that would be needed, *see* R. 74, so scheduling of those depositions should start promptly.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: January 24, 2017